**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RALPH HASELMANN, | : | |
| | : | CIVIL ACTION NO. 04-3213 (MLC) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| KELLY SERVICES, INC., et al., | : | |
| | : | |
| Defendants. | : | |

**COOPER, District Judge**

The defendants, Kelly Services, Inc. ("KSI"), Kelly Financial
Resources ("KFR") (collectively "Kelly"), Shannon Ross Stahl
("Stahl"), and Stacy Andrieux ("Andrieux"), move for summary
judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.
(Dkt. entry no. 20.)  The plaintiff, Ralph Haselmann
("Haselmann"), cross-moves for (1) summary judgment on his claim
under the New Jersey Law Against Discrimination ("NJLAD"), and
(2) an adverse inference or other sanction against the defendants
based on spoliation of evidence.  (Dkt. entry no. 25.)  The
Court, for the reasons stated herein, will (1) grant the part of
the motion seeking summary judgment on the claims for constructive
discharge and intentional infliction of emotional distress
("IIED"), (2) deny the part of the motion seeking summary judgment
on the NJLAD claim, (3) deny the part of the cross motion seeking
summary judgment on the NJLAD claim, and (4) deny the part of the
cross motion seeking an adverse inference or other sanction.

**BACKGROUND**

## I.    KSI Hires Haselmann As An Account Manager

KSI hired Haselmann in March 1999 as an "account manager" in a New Brunswick branch office that provided temporary accounting, engineering, and information technology ("IT") services to its customers.  (Defs. Statement of Undisputed Material Facts ("Defs. St."), at ¶ 6.)[1]  Haselmann was 60 years old when KSI hired him. (Id. at ¶ 7.)  Haselmann's duties included "mak[ing] sales calls, [and] bring[ing] in job orders," for accounting, engineering and IT services.  (Id. at ¶ 8.)

After working at KSI for approximately 6 months, Haselmann asked his manager, Barry Kouns ("Kouns"), if he was on track for a promotion to branch management.  (Id. at ¶ 9.)  Kouns advised Haselmann that a promotion was "not in the cards."  (Id.)  Kouns informed Haselmann that KSI had started a new business unit to provide accounting and financial services, to be called Kelly

---

[1] The Court cites to the parties' statements of undisputed material facts where the statements are admitted by the opposing party.  Otherwise, the Court will refer to the various exhibits submitted by parties.

The Court, at oral argument on June 16, 2006, requested Haselmann's counsel to submit a supplemental brief with citations to the record, his counter statement of undisputed material facts, or to his appendix.  (Dkt. entry no. 31, 6-16-06 Oral Arg. Tr., at 51-52.)  The defendants have alleged that Haselmann exceeded the Court's instructions by, inter alia, providing revised citations in his counter statement of undisputed material facts.  (7-21-06 Defs. Ltr.)  The Court has considered only those changes made in accordance with the Court's directions on June 16, 2006.

2

Financial Resources ("KFR"), and suggested that he contact the manager of KFR to see if he could arrange an interview for a branch manager position. (<u>Id.</u> at ¶ 10.) Haselmann contacted the manager and vice president of KFR, Bob Lyons ("Lyons"), and interviewed with him. (<u>Id.</u> at ¶ 11.)

## II. Haselmann's Promotion To Branch Manager At KFR

Lyons offered Haselmann the position of Branch Manager of KFR's New Jersey branch office in the summer of 2000. (<u>Id.</u> at ¶ 12.) The position would be effective as of September 2000 and represent a promotion for Haselmann from a grade-level 18 position in sales to a grade-level 22 position as Branch Manager. (<u>Id.</u>) Haselmann was 61 years old when he was promoted. (<u>Id.</u> at ¶ 13.)

As Branch Manager, Haselmann was responsible for managing the activities of the New Jersey branch office, including, <u>inter alia</u>, (1) developing KFR's local market share through the increase of sales and maintenance of the current client base, (2) achieving or exceeding the branch's sales goals, and (3) conducting high level sales presentations to both potential and existing customers. (<u>Id.</u> at ¶ 14; Pl. Response to Defs. St. ("Pl. Resp."), at ¶ 14.) Haselmann was also responsible for increasing head count by being actively and personally involved in sales activities. (Defs. St., at ¶ 15.) Haselmann stated that he was personally involved in sales activities by (1) visiting every existing client that [KFR] had, introducing

3

himself, and providing them with his contact information, (2) contacting these clients regularly to inform them about new programs at KFR, and (3) seeking referrals to other managers in the division that might need temporary workers.  (Id.; Pl. Resp., at ¶ 15.)  Haselmann indicated that "the best way [he] could meet [KFR's] profit objectives and net contribution objectives was to increase the penetration in the existing accounts that [KFR] had."  (Defs. St., at ¶ 15 (quoting Haselmann Dep., at 81-82).)  Although part of Haselmann's duties included making high-level sales presentations to customers, he did not make any such presentations alone.  (Id. at ¶ 16.)[2]

When Haselmann started as Branch Manager, he reported directly to Lyons.  (Id. at ¶ 17.)  Lyons stated that when KSI started KFR in September 2000, the client mix in the New Jersey branch was approximately 95 percent Corporate and Office of the President ("OOP") accounts, and 5 percent retail accounts.  (1-5-06 John K. Bennett Aff. ("Bennett Aff."), Ex. E, portions of Lyons Dep. Tr. ("Lyons Dep."), at 30.)[3]  Lyons expected that the

_____

[2] Haselmann disputes this characterization of his deposition testimony, noting that he made high level sales presentations. (Pl. Resp., at ¶ 16.)  However, Haselmann provides no citation to the record or to his deposition testimony where he states that he made high level sales presentations alone.  Haselmann does state that he "made calls on retail prospects, who were not yet customers, and . . . made calls alone."  (1-23-06 Haselmann Cert., at ¶ 2.)

[3] Kelly's clients were made up of a mix of both Corporate and OOP accounts, and smaller retail accounts.  (Defs. St., at ¶

retail business would have been gradually built over time to a percentage of about 30 to 40 percent of the mix.  (Lyons Dep., at 30.)  Lyons indicated that he had "[n]o real expectation in terms [of the length of time it would take to increase the mix of retail clients, but that it was more a function of the manager's ability to change the mix."  (Id.)  Lyons looked for a 5% to 10% increase each year in the retail portion of the client mix.  (Id. at 31.)

Lyons believed that the important aspects of a Branch Manager's responsibilities included "[d]riving the sales line, driving product mix, mix of retail, mix of Corporate accounts, leadership of staff, interaction with other Kelly units, [and] cross-selling."  (Id. at 88.)  Lyons stated that (1) it was up to the individual branch manager how to accomplish bringing in business, and (2) he expected branch managers to sell for the large and retail accounts, but that a particular manager could focus his or her time and attention on one of the types of accounts more than the other.  (Id. at 61-63.)

---

18.)  A Corporate or OOP account is a large client, like Johnson & Johnson ("J&J") and Merck, Inc. ("Merck"), that commits to give Kelly a high volume of placement business in consideration for lower prices; therefore, its profit margins are lower.  (Id.)  A retail account is one with which Kelly has a smaller number of transactions, priced at higher margins.  (Id.)  Kelly's "profit margin" is the difference between what it bills its client, minus what it pays the temporary employees and all of the statutory taxes and benefits associated with that placement.  (Id.)

## III. Haselmann's Performance Reviews For Years 2001 and 2002

Lyons gave Haselmann a performance review as Branch Manager for the calendar year 2001 in May 2002.  (Defs. St., at ¶ 23.) Lyons rated Haselmann's performance as a 2.3 B.  (Id.)[4]  In his comments explaining the review, Lyons stated:

> Financial results for 2001 were very disappointing. Sales were off budget by 35%, GP$ [Gross Profit Dollars] off by 45%, and GP% [Gross Profit Percentage] off by 2.8 points. . . .  Overall contribution missed budget by 87%.
>
> In analyzing Ralph's results, a few things are to blame. A majority of Ralph's budget for 2001 was inherited with the transfer of headcount from the KITR NJ branch. Unfortunately the IT manager budgeted for his accounting headcount to grow throughout 2001 when i[n] fact it was already steadily in decline from August of 2000.  Ralph inherited the headcount (and robust budget) in January of 2001 well beyond his ability to have any correction made to the numbers he inherited.  The delta between what was budgeted and what Ralph inherited was something that he chased for all of 2001 and couldn't make up the shortfall.  On his own watch however, he failed to reach his first year KFR pro forma goals for new retail business coming into the branch.
>
> Ralph was challenged early on in hiring a strong lead recruiter to be his second and that time hurt his performance.  Toward the end of 2001 I believe Ralph was able to stabilize his personnel issues and is heading into 2002 in a much better situation.  I believe Ralph is well respected by his staff and Kelly peers in the market.  He actively participates in any opportunities to

---

[4] The rating system for "business results" are rated numerically, and "leadership traits" are rated alphabetically. (Defs. St., at ¶ 23; Pl. Resp., at ¶ 23.)  A review of "A" and "1" indicate, "Regularly exceeds job requirements." (Defs. St., at ¶ 23; Pl. Resp., at ¶ 23.)  A review of "B" and "2" indicate, "Good solid performance.  Meets or slightly exceeds requirements of the job." (Defs. St., at ¶ 23; Pl. Resp., at ¶ 23.)  Finally, a review of "C" and "3" indicate, "Performance is less than expected and needs improvement in several areas." (Defs. St., at ¶ 23; Pl. Resp., at ¶ 23.)

promote Kelly as a unified client solution.  An area of improvement I've discussed with him is his ability to challenge the Kelly "norms" and not be so submissive to the Commercial group or our on site teams.  One of our challenges with the NJ market is it's a hotbed for Kelly's [C]orporate and OOP accounts, all of which are priced at low margins.  We need every order possible to have it make sense for us.  Holding back or waiting for someone else to try and introduce us into the account is not an option at this point.  Ralph and his team should know he has the backing to move forward engaging as many finance managers as we can.

I'm highly encouraged by the reversal of results I've seen early in 2002.  Our big obstacle is finding enough retail type business to offset our [C]orporate accounts.  This is a top priority for KFR NJ.

(Id. at ¶¶ 24-26; Bennett Aff., Ex. A, 1-25-05 Haselmann Dep. Tr. ("Haselmann Dep."), at 91-92 & Ex. D-5, RHasel 0044.)[5]  Lyons discussed his review with Haselmann point-by-point, and Haselmann admitted that this review was fair and accurate.  (Defs. St., at ¶ 29.)

Lyons observed that Haselmann tended to try to develop his business from the existing accounts, as opposed to "going out and trying to bring in new business via his own personal sell." (Lyons Dep., at 212-13.)  Lyons stated that he counseled Haselmann to be more proactive in seeking new business.  (Id.) Lyons claimed that Haselmann

tended to be very passive.  Although he was instructed to reach out even on our existing Kelly accounts to make independent sales calls to financial managers.  Passive or submissive being that he tended to sit back and

---

[5] "Contribution" is the bottom line profit to the business. (Defs. St., at ¶ 19.)

> hopefully wait for an order to come from the [client's]
> finance department to our Commercial on-site team who
> would then pass him the request.

(Id. at 213.)  Thus, Lyons wanted Haselmann to work on "developing

a book of business outside of the Kelly accounts and not

surviving on accounts he had inherited."  (Lyons Dep., at 216.)

Lyons reviewed Haselmann's 2002 performance in April 2003.

(Defs. St., at ¶ 31.)  Lyons rated Haselmann as a "2 B."  (Id.;

Haselmann Dep., at 95, Ex. D-5, RHasel 0045.)  In his comments

explaining this review, Lyons pointed out that

> 2002 represented a real turn around year for KFR New
> Jersey. . . .  In 2002, our branch sales beat budget by
> 18%, GP$ beat budget by 4%, and expenses were below
> budget by 3%.   While the branch was profitable,
> contribution was still off budget by 43%.  The story here
> was Ralph's inability to keep his gross profit at a high
> enough percentage. . . .  Had Ralph got his branch GP to
> budgeted expectations, he would have beat his budgeted
> contribution goal.  There were a few reasons by GP% was
> low.  One, Ralph's branch services a lot of [C]orporate
> and OOP clients w[h]ere his rates are already at low GP
> and not determined by him.  The expectation of being in
> the shadow of Metro New York is that we can do more than
> off set [sic] this low mark up business by having a
> multitude of retail accounts.  In any other year that may
> be so but there was no doubt that the local NJ economy
> felt the effects of 9/11.  Many of the smaller firms that
> we would have expected to gain retail business from
> either didn't have business to give or went out of
> business themselves.
>
> As bad as the economy might have been, I'm still
> convinced that there was more retail business out there
> to get.  I'm not totally convinced we were looking in all
> the right places for it.  During most of the year Ralph
> did have the benefit of having a dedicated account rep to
> help get some retail accounts.  Whether this rep was
> misguided, or too reliant on having commercial reps get
> him into accounts, the bottom line was he was
> ineffectual. . . .  We now have an experienced KFR rep

who came with a successful record from another branch.
Early signs are that she is uncovering pockets of retail
opportunities which means the business we needed was
there all along. . . .

An area that continues to be a point of discussion with
Ralph and I is his ability to challenge the "Kelly norms"
when it comes to getting business from Kelly accounts.
I continue to sense that Ralph is patient to wait for an
on site to call him with business, yet quick to complain
if he finds out that a financial competitor is in a Kelly
account. . . .

I have been very pleased with the way 2003 has started
out for Ralph's branch.  He and his staff continue to
show the same strong trends that were established last
year with better performance on the contribution targets.
I believe 2003 can be his strongest year ever.

(Id. at ¶ 32 & 35; Pl. Resp., at ¶ 32; Pl. Appx., at 155.)

In the review of Haselmann's 2002 performance as Branch

Manager, Lyons attributed Haselmann's failure to meet his budget

for gross profit percentage to his failure to get a better mix of

retail sales business.  (Defs. St., at ¶ 33.)  Haselmann admits

that Lyons encouraged him to develop retail business to increase

the profitability of his branch.  (Id. at ¶ 34; Pl. Resp., at ¶

34.)  Lyons also discussed with Haselmann the need for him to

develop relationships with existing accounts.  (Defs. St., at ¶

37.)  Lyons encouraged Haselmann to not "sit back and wait for

the [Kelly] Commercial on-site to notify him of a potential . . .

opportunity, [but rather go] directly to the [customers']

financial managers and cultivat[e] a relationship with them where

they would call him directly."  (Lyons Dep., at 79.)  Lyons

explained that Haselmann was "very passive in waiting for

9

business to come to him through a Kelly contact as opposed to going out and getting it on his own; that was the point of our developmental conversations."  (Id. at 80.)

## IV.  Stahl Becomes Haselmann's Supervisor In April 2003

Stahl was named the Director of the newly-formed Eastern Region of KFR in April 2003.  (Defs. St., at ¶ 40.)[6]  Stahl reported directly to Lyons, and Haselmann reported directly to Stahl.  (Id.)  Stahl, as Regional Director, had full profit-and-loss responsibility for the Eastern Region, and was responsible for, inter alia, (1) business development, (2) recruiting, hiring, and retaining staff members, (3) having an appropriate database of the skills to be provided to clients, and (4) providing customer service to clients.  (Bennett Aff., at Ex. C, 4-28-05 Stahl Dep. Tr. ("Stahl Dep."), at 34.)  Stahl stated that, as to the KFR New Jersey branch, Lyons identified the need to develop more retail business.  (Stahl Dep., at 52.)  Stahl, after reviewing the KFR New Jersey branch's operations, believed that the branch was "hurting for retail business, yet at the same time . . . there was significant opportunity within the large accounts as well that . . . [were not being] grasp[ed] onto."  (Id. at 66-67.)  As part of his reporting to Stahl, Haselmann

_____

[6] Stahl was in her thirties in March 2003.  (Pl. Counter Statement of Undisputed Material Facts ("Pl. Counter St."), at ¶ 5; Defs. Response to Pl. Counter St. ("Defs. Resp."), at ¶ 5.)  The defendants admit that Stahl was "substantially younger" than Haselmann.  (Defs. Resp., at ¶ 41.)

submitted his weekly activity reports to her as of April 1, 2003.
(Defs. St., at ¶ 45.)  These weekly reports reflected all
activity within the branch, including sales calls made, job
orders that came in, and results of placements.  (Id.)

## V.   Stahl's Review Of The New Jersey Branch And Haselmann's Performance In 2003

Stahl visited the KFR New Jersey branch in April 2003 and
June 2003.  (Defs. St., at ¶¶ 46-47; Pl. Resp., at ¶¶ 46-47;
Stahl Dep., at 54-62, 76-77.)  During her April 2003 visit, Stahl
met with staff including Haselmann.  (Defs. St., at ¶ 47; Pl.
Resp., at ¶ 47.)  During the June 2003 visit, Stahl and Haselmann
discussed retail sales planning, corporate/large accounts
penetration, and candidate marketing skills by the recruiters.
(Defs. St., at ¶ 47; Pl. Resp., at ¶ 47.)  Haselmann and Stahl
also attended a 3-day meeting in Florida.  (Defs. St., at ¶ 48.)
Stahl also visited the New Jersey branch office to discuss sales
activities and a major initiative with the J&J account.  (Id. at
¶ 49.)  Stahl and Haselmann also engaged in phone conversations
during her first few months as Regional Director.  (Id. at ¶ 50;
Pl. Resp., at ¶ 50.)

Stahl stated that by the late summer and early fall of 2003,
she determined that Haselmann's "interpretation of . . . what he
personally needed to be doing [differed] from [her] experience
within Kelly."  (Stahl Dep., at 77.)  Stahl, based on her review
of the weekly reports, believed that the recruiter who reported

11

to Haselmann was doing the majority of the sales activity, rather
than Haselmann himself.  (<u>Id.</u> at 78-80.)  Stahl "realized that
the role that . . . Haselmann had created for himself was not
consistent with what we would consider the role of a branch
manager." (<u>Id.</u> at 85.)

**VI.  Stahl's September 2003 Mid-Year Review**

Stahl conducted her 2003 mid-year review of Haselmann's
performance in September 2003.  (Defs. St., at ¶ 53.)  In her
review, Stahl stated: "Very nice year-to-date performance on all
fronts — the three areas that you need to work on are: increase
in retail order activity; penetration of Corporate/OOP accounts
and increase in direct placements."  (<u>Id.</u>)  Stahl also pointed
out that Haselmann needed not only to hold his sales staff
accountable to specific quantifiable metrics, but also that he
"need[ed] to, as a selling branch manager, establish clear,
quantifiable sales metrics and targets for you to achieve."  (<u>Id.</u>
at ¶ 56.)  As part of the self-evaluation portion of the mid-year
review, Haselmann indicated that he needed improvement in his
"Internal/External Customer Focus," particularly "need[ing] to
work harder to cultivate long-term client relationships."  (<u>Id.</u>
at ¶ 55.)

Stahl also indicated in her mid-year review that the
greatest challenges she had for Haselmann for the balance of 2003
and launching into 2004 were (1) increasing retail orders; (2)

12

further penetrating Corporate Accounts/OOP accounts; (3) increasing direct placements; (4) understanding why some of our accounts have declined in volume; and (5) building more practical recruiting knowledge for the benefit of mentoring and advancing recruiters.  (Id.; Pl. Appx., at 176.)  With respect to penetrating accounts, Haselmann understood Stahl to be telling him to continue "exactly what [he] was doing[,] . . . increasing the penetration to major accounts."  (Haselmann Dep., at 168.) Also, as to increasing retail orders, Haselmann understood Stahl was asking him "to make more sales calls to retail accounts to get job orders."  (Id. at 167.)

**VII. Stahl Imposes Five Sales Call Per Week Requirement**

Stahl informed Haselmann on or about October 8, 2003, that he and all other branch managers were required to make at least 5 sales calls per week.  (Id. at 171.)[7]  Stahl told Haselmann that the 5 face-to-face calls should consist of 2 with existing clients and 3 with prospective clients.  (Id. at 173.)  Stahl stated that she determined that the 5 sales calls per week was a reasonable number because of the numbers of sales calls made by other branch managers.  (Stahl Dep., at 86-89.)  Over the next 4 weeks, Haselmann made 17 sales calls, which was less than the target of 5 per week.  (Defs. St., at ¶ 62; Pl. Resp., at ¶ 62.)

---

[7] Haselmann's 65th birthday was also on October 8, 2003. (Pl. Counter St., at ¶ 9.)

VIII.   **Stahl Observes Haselmann's Performance During Sales Calls In October 2003 And Initiates Placing Him On Performance Improvement Plan**

Stahl went on a series of sales calls with Haselmann in early October 2003 and observed his performance first-hand. (Stahl Dep., at 152-60.)  Other Kelly employees were present for these sales calls.  (Id. at 152-57.)  Stahl felt that Haselmann failed to adequately contribute enough input during these sales calls.  (Id.)  Stahl also believed that Haselmann did not customize his presentations when calling on existing accounts for particular opportunities.  (Id. at 158-59.)

Stahl sent Haselmann "kind of a quasi-congratulatory note" on October 30, 2003, presenting him with a third-quarter bonus check.  (Defs. St., at ¶ 63; Pl. Resp., at ¶ 63; Haselmann Dep., at 195-96; Bennett Aff., Ex. B, at RHasel0047, copy of 10-30-03 note ("10-30-03 Note").)  The note stated, inter alia:

I am pleased to present you with your Q3 bonus check!

I see only significant growth for New Jersey! — what an outstanding list of prospective clients to mix with your existing, prestigious portfolio — marry that with the solid delivery capability of your recruiters and you have absolute success!

My challenge?  Sell, sell, sell!!!

(10-30-03 Note.)  Stahl stated that she intended that the note serve as a "motivational communication."  (Stahl Dep., at 168.)

Stahl conferred with Andrieux, KSI's human resources manager responsible for supporting the KFR business unit, about the possibility of placing Haselmann on a Performance Improvement

14

Plan ("PIP").   (Bennett Aff., Ex. F, 5-11-05 Andrieux Dep. Tr.
("Andrieux Dep."), at 36-37.)[8]   Andrieux stated that she
determined that it was appropriate to place Haselmann on a PIP
after (1) discussing his performance with Stahl, (2) reviewing
his 2003 mid-year review, and (3) assessing that he had been
adequately coached and had his performance issues addressed with
him.   (Id. at 42-43.)   Andrieux indicated that Haselmann's need to
improve his sales activities was "a repeated theme and message to
him from back when he reported to . . . Lyons."   (Id. at 60-61.)

IX.  **Haselmann Placed On First PIP In November 2003**

     Stahl drafted Haselmann's PIP for Andrieux's review.   (Id.
at 50.)   Stahl also discussed the PIP with Lyons before
presenting it to Haselmann.   (Lyons Dep., at 103-08.)   Stahl
presented Haselmann — via facsimile — with the written PIP on
November 11, 2003.   (Defs. St., at ¶ 68.)   The PIP provided:

> The purpose of this document is to formally advise you of
> my concerns as it relates to: your sales ability and the
> management of your office.
>
> We've had a number of informal discussions on the subject
> of the "selling branch manager" as well as formally
> discussing in your Mid-Year Performance Review on
> 9/11/2003.   Since then, on 10/8/2003, we discussed your
> targeting a minimum of 5 face-to-face sales appointments
> per week, with no more than 2 appointments occurring with
> existing customers.   Also occurring on 10/8, was an
> appointment with [BD].   I have to admit, Ralph, I was
> honestly astonished when the client turned to you, on two

_____

     [8] The defendants admit that Andrieux was "substantially
younger" than Haselmann.   (Pl. Counter St., at ¶ 42; Defs. Resp.,
at ¶ 42.)

separate occasions, and called out the fact that you had not contributed in any way during the discussion.  You had been the one who prompted Duane Green to request the appointment — but ultimately, once he secured the appointment, it appeared to me that you failed to prove yourself in working to secure the business.  Finally, I have received multiple unsolicited comments from your co-workers that they are not confident with your sales approach — i.e., earning the customer's business, your ability to present our capabilities, etc.

Since our interaction on 10/8, I know that you have been focused on achieving the face-to-face appointment targets and have produced 4, 5, 4 and 4 calls/week during the last 4 weeks.  The reason for this plan at this time on the sales side, is then three-fold:

1. Please continue working to achieve the 5 face-to-face appointment minimum.
2. We will also monitor how many orders are resulting from your sales call activity and decide upon within the next two weeks, an appropriate conversion ratio — i.e., 3 orders per 5 appointments, etc.?
3. Order activity/results are directly correlated to the effectiveness of your selling.  If a prospect is a known user of finance and accounting staffing — there should be no reason why [KFR] should not be their supplier of choice.  If you need assistance with the pitch or the approach I am more than happy to help.

In addition, on the leadership/management side, I must reference a couple of concerning points:

1. Upon observing interactions with your staff, I have observed behavior that is inappropriate of a subordinate to a direct report.
2. One staff member indicated that the office is "run by the staff."
3. On another occasion a staff member questioned who is accountable for sales in the branch?

Ralph, on the leadership side, I need to see you:

1. Develop the type of rapport with your staff where there is a free exchange of information yet, at the end of the day, the recruiters recognize who their leadership is.

16

2.   Bring value to the recruiters to the extent
that you are coaching them, bringing them
value in their daily jobs and offering
structure and guidance.   Over time, these
interactions should translate into a renewed
respect between the recruiters and you.

Attached is the Action Plan which outlines additional
specifics.

We will review your progress on a weekly basis in both
categories.   This plan will be in [e]ffect through
**December 15, 2003.**   There is the possibility that it
could be extended if I do not think that I have proper
evidence with which to make a decision.

(Haselmann Dep., at 176 & Ex. D-8; Bennett Aff., Ex. B.)

The PIP also included two attachments.  (Id.)  The first

attachment stated that "[i]f significant improvement does not

occur immediately, you do not sustain a satisfactory or better

level of performance on an ongoing basis throughout this plan, or

any of the performance problems discussed reoccurs after

completion of the plan, you may be subject to further corrective

action including immediate termination of your employment."

(Id.)  The second attachment is the "Action Plan," which

indicated that Haselmann must, inter alia, (1) achieve a minimum

of 5 face-to-face sales appointments per week, (2) convert

appointments to orders, and (3) contribute to the branch

performance by his own sales efforts.  (Id.)

Stahl and Andrieux conducted a teleconference with Haselmann

after faxing him the PIP.  (Andrieux Dep., at 51-52.)  Haselmann

"expressed disbelief and couldn't understand why he was put on

17

what he called probation." (Id. at 52.)  Stahl, at Haselmann's
request, permitted him to review the PIP in more detail. (Defs.
St., at ¶ 70.)

Haselmann, in an E-mail to Lyons, Stahl, and Andrieux, sent
later on November 11, 2003, questioned the need to place him on a
PIP. (Pl. Appx., at 159.)  In the E-mail, Haselmann noted that,
among other things, (1) he had just received a congratulatory
note on October 30th, just 11 days earlier, from Stahl, (2) the
New Jersey branch is one of the best performing branches, and (3)
he had only received performance reviews that were "good . . . or
very good." (Id.)  Haselmann also stated, "I find the timing of
this very curious, coming 1 month after my 65th birthday!  It
appears to me that something else might be at work here, other
than performance." (Id.)  Haselmann also stated that he was "a
selling Branch Manager" as indicated by his work with three
specific companies. (Id.)

Andrieux contacted Haselmann later that day to discuss the
reference to his 65th birthday in his E-mail. (Defs. St., at ¶
73.)  Andrieux understood the reference to raise a concern of
possible age discrimination. (Andrieux Dep., at 69.)  As such,
Andrieux stated that Haselmann's age had nothing to do with the
decision to place him on a PIP, that they did not know his
birthday or his age, "or something innocuous to that effect."
(Id.)  Haselmann did not raise the issue of his age to Stahl or

Andrieux other than in his E-mail message of November 11, 2003.
(Id.)  Also, neither Andrieux, Stahl, nor Lyons took any further
steps regarding Haselmann's comments about his age.  (Andrieux
Dep., at 82; Stahl Dep., at 198-99.)

Over the five-week period of the November 11, 2003 PIP,
Stahl and Andrieux conducted weekly progress-review discussions
with Haselmann.  (Defs. St., at ¶ 78.)  Each week, Haselmann
prepared his own progress notes as to steps he had taken, and
discussed his progress with Stahl and Andrieux.  (Id.)  Stahl
stated that, towards the end of the time period of this PIP, she
concluded that Haselmann was moving in the right direction as to
increasing the number of his sales calls, but that his "face time
in front of the client required some work and [they] were . . .
working on that together."  (Stahl Dep., at 211.)  Stahl was also
concerned with the effectiveness of Haselmann's management of the
branch team, and the unsolicited feedback she received from Kelly
peers about his effectiveness.  (Id. at 211-12.)  Stahl also
discussed with Lyons about extending Haselmann's PIP.  (Lyons
Dep., at 168-69.)  Lyons agreed with the decision to extend the
PIP.  (Id. at 170.)

**X.   Haselmann Placed On Extended PIP In December 2003**

Stahl met with Haselmann on or about December 16, 2003, with
Andrieux participating by telephone, to advise him that she was
extending his PIP for another 6 weeks (the "Extended PIP").

(Defs. St., at ¶ 81; Haselmann Dep., at 234-40 & Ex. D-18.)  In the Extended PIP, Stahl commented that while Haselmann had worked towards the target of 5 sales calls per week, only a very few orders and placements had resulted from those calls.  (Defs. St., at ¶ 81.)[9]  Stahl also expressed concerns about Haselmann's (1) approach, particularly his level of preparation, research and due diligence, when dealing with prospective customers, and (2) management of the branch staff.  (Id. at ¶ 82.)  Stahl further noted that Haselmann's peers in other Kelly businesses were not comfortable with his customer interactions and therefore were not inviting him to customer meetings.  (Id.)

The Extended PIP set forth specific expectations for Haselmann to demonstrate improved performance through January 30, 2004, in three areas: (1) sales, (2) management of branch staff, and (3) level of interaction with peers from other Kelly business units in New Jersey.  (Id. at ¶ 84.)  As to sales, Stahl focused Haselmann's efforts on converting his five appointments per week into actual orders and placements, and improving his methods of working through the sales process.  (Id.)  Concerning his management of staff, Stahl wanted improvement in Haselmann's exchanges with the branch's recruiters.  (Id.)  Regarding his

---

[9] Despite the Extended PIP only identifying 23 calls through December 16, 2003, Haselmann states that he made 25 calls during that time.  (Haselmann Dep., at 237-39.)  Haselmann further indicates that 9 job orders and 3 placements, which came in after December 16, 2003, resulted from those calls.  (Id.)

Kelly peers, Stahl informed Haselmann that she expected him to engage in as many cross-selling opportunities as possible with the leaders of other Kelly business units in New Jersey.  (Id.) Stahl also specifically identified business unit heads who allegedly had expressed unwillingness to cross-sell with Haselmann.  (Pl. Resp., at ¶ 84.)

The Extended PIP also provided for follow-up review discussions, at the conclusion of which, Haselmann could be removed from the PIP if he (1) had corrected the performance problems discussed and achieved the performance objectives, or (2) demonstrated significant progress.  (Defs. St., at ¶ 85.) The Extended PIP stated that if, by January 30, 2004, Haselmann's employment could be terminated if he had not (1) maintained at least a satisfactory level of performance, (2) achieved the established performance objectives, or (3) made significant progress in achieving those objectives.  (Id.)

Stahl also discussed the Extended PIP with Haselmann on December 16, 2003, and reviewed the results of his sales calls. (Id. at ¶ 86.)  Stahl told Haselmann that she continued to receive negative feedback from his subordinates, and unsolicited negative feedback from his peers in other Kelly businesses. (Id.)  Stahl also informed Haselmann that they would review his progress towards the action plan every week, through the end of January 2004.  (Id. at ¶ 87.)

21

Stahl and Andrieux conducted weekly progress-review discussions with Haselmann during the 6 weeks of the Extended PIP.  (Id. at ¶ 88.)  Each week, Haselmann prepared his "progress review notes" on the Extended PIP action plan, and he discussed his progress with Stahl and Andrieux.  (Id.)

Haselmann reported that he was able to schedule 1 in-person sales call during the last week of the Extended PIP.  (Id. at ¶ 90.)  He also indicated that only 1 of the 98 people whom he had called during that week had returned his telephone call.  (Id.) He told Stahl and Andrieux that he had run into a "brick wall." (Id.)  Stahl asked Haselmann to count all of the sales calls he made and orders placed during the Extended PIP period, and E-mail them to her.  (Id.)  Haselmann sent Stahl an E-mail on February 2, 2004, confirming that he made 10 sales calls, received 5 orders, and filled 1 order and had 1 pending.  (Id. at ¶ 91; Pl. Resp., at ¶ 91.)  Stahl told Haselmann that this was "a very low number of sales calls and she was not pleased with them." (Haselmann Dep., at 277.)

## XI.  Haselmann's Employment Terminated In February 2004

Lyons, Stahl, and Andrieux conferred about Haselmann's progress during the Extended PIP.  (Lyons Dep., at 179; Stahl Dep., at 280-81; Andrieux Dep., at 91.)  Stahl determined that (1) Haselmann's sales appointments and transactions had declined significantly, (2) the content of his sales interactions was

22

weak, and (3) cross-selling meetings with other Kelly businesses
in the marketplace were non-existent.  (Stahl Dep., at 282.)  A
"consensus" of Stahl, Lyons, a human resources representative,
and Lyons's boss, decided to terminate Haselmann's employment.
(Lyons Dep., at 194-98.)  Lyons stated that they based the
decision on Haselmann's performance versus the action plan in the
PIP, and his lack of significant improvement.  (Id. at 194, 197-
98.)[10]

   Stahl and Andrieux met with Haselmann at the KFR New Jersey
branch office on February 4, 2004, and told him that they were
terminating his employment.  (Defs. St., at ¶ 95.)  Stahl told
Haselmann that Lyons had approved this decision.  (Defs. St., at
¶ 96.)  Stahl "reiterated the fact that [Haselmann] didn't
perform according to their standards on probation [the PIP], and
that they were letting [him] go."  (Id.)  Stahl told Haselmann
something to the effect that she had tried to coach and counsel
him, but that he did not take her suggestions.  (Id.)  Haselmann
"didn't have anything to say . . . [b]ecause [there] wasn't
anything [he] could say.  The decision had been made; the dye
[sic] had been cast a long time ago."  (Pl. Resp., at ¶ 95.)
About 5 months after terminating Haselmann's employment, Kelly
hired John McGowan, who was then 44 years old, as the Branch
Manager for KFR's New Jersey branch.  (Defs. St., at ¶ 100.)

---

   [10] Lyons was 52 years old when Haselmann was terminated.
(Defs. St., at ¶ 94; Pl. Resp., at ¶ 94.)

**XII. Haselmann's Commencement Of Litigation & Discovery Dispute**

Haselmann brought this action in state court on May 19, 2004, asserting claims of (1) age discrimination in violation of NJLAD, (2) constructive discharge, and (3) IIED. (Dkt. entry no. 1, Rem. Not., at ¶ 2; Compl.)  The defendants removed the action pursuant to 28 U.S.C. § 1332.  (Rem. Not., at ¶ 8.)  The defendants answered the complaint on July 28, 2004.  (Dkt. entry no. 4.)

Haselmann's counsel sent the defendants a letter dated July 29, 2005, requesting, <u>inter alia</u>, "[b]ased upon . . . Stahl's deposition testimony, . . . all weekly activity reports for the time . . . Stahl became [Haselmann's] supervisor through the date of [his] discharge for all branch managers Stahl supervised." (Dkt. entry no. 8, Kelly Cert., at ¶ 12 & Ex. I.)  The defendants replied by characterizing the request for the weekly activity reports as a "new" request made after discovery was closed.  (<u>Id.</u> at ¶ 13 & Ex. J.)  In light of the defendants' response, Haselmann then raised a discovery dispute before the Magistrate Judge on September 12, 2005.  (<u>Id.</u> at ¶ 14.)

The Magistrate Judge ordered, with respect to the weekly activity reports, the defendants to produce all weekly activity reports that Stahl reviewed in connection with her determination that 5 sales call per week was a reasonable target for a KFR branch manager.  (<u>Id.</u> at ¶ 15 & Ex. K.)  The defendants responded to the order by explaining that (1) Stahl did not rely on the

24

weekly reports in determining that 5 sales calls per week was a
reasonable number, and (2) to the extent that Stahl did rely on
the weekly reports, said reports were destroyed in the ordinary
course of business.  (Id.)  Although Haselmann moved to compel
discovery on October 14, 2005, he did not mention the weekly
activity reports in the motion.  (Dkt. entry no. 7.)  The
Magistrate Judge denied the motion on November 9, 2005.  (Dkt.
entry no. 14.)  Haselmann appealed from that order on November
17, 2005, and the Court affirmed the Magistrate Judge's order on
December 20, 2005.  (Dkt. entry nos. 15, 19.)

     The defendants moved for summary judgment on January 10,
2006.  (Dkt. entry no. 20).  Haselmann filed his opposition brief
and cross-moved for summary judgment on January 24, 2006.  (Dkt.
entry nos. 21-25.)  The Court heard oral argument from the
parties on the motion and cross motion on June 16, 2006.  (Dkt.
entry no. 31.)

**DISCUSSION**

**I.   Standard For Summary Judgment**

     Rule 56(c) provides that summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Id.  The party moving for summary judgment bears the initial

25

burden of showing that there is no genuine issue of material
fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once
the movant has met this prima facie burden, the non-movant "must
set forth specific facts showing that there is a genuine issue
for trial."  Fed.R.Civ.P. 56(e).  A non-movant must present
actual evidence that raises a genuine issue of material fact and
may not rely on mere allegations.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  At the summary judgment stage, the Court's role is
"not . . . to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial."  Anderson, 477 U.S. at 249.  Under this standard, the
"mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient [to defeat a Rule
56(c) motion]; there must be evidence on which the jury could
reasonably find for the [non-movant]."  Id. at 252.  "By its very
terms, this standard provides that the mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact."
Id. at 247-48 (emphasis in original).  A fact is material only if

26

it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

### B.   NJLAD Claim of Age Discrimination

The defendants argue that summary judgment should be entered in their favor on Haselmann's NJLAD age discrimination claim because he cannot (1) establish a prima facie case because he fails to show that he was performing his job at a level that met Kelly's legitimate expectations, or (2) demonstrate that the performance-related reasons for the decision to terminate his employment were merely a pretext for age discrimination.  (Defs. Br., at 1-3.)  Haselmann asserts that the Court should allow a spoliation inference based on the defendants' failure to produce 2003 weekly activity reports of other KFR branch managers.  (Pl. Br., at 15-16.)  Also, Haselmann argues that the Court should enter summary judgment in his favor on the NJLAD claim because the spoliation inference and the other objective evidence of record show that "no rational fact finder would believe that [the d]efendants acted for their purported legitimate reason."  (Pl. Br., at 26.)  The Court finds that (1) Haselmann is not entitled to a spoliation inference, and (2) there are disputed issues of

material fact that prevent summary judgment from being entered in favor of either party on this claim.

        1.   NJLAD & burden-shifting framework

The NJLAD makes it is unlawful "[f]or an employer, because of the . . . age . . . of any individual . . . to discharge . . ., unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ."  N.J.S.A. § 10:5-12(a).  The Court, when analyzing claims of employment discrimination under NJLAD based on circumstantial evidence, employs the <u>McDonnell Douglas-Burdine</u> burden shifting framework at the summary judgment stage.  <u>See</u> <u>Zive v. Stanley Roberts, Inc.</u>, 867 A.2d 1133, 1139 (N.J. 2005) (explaining that, because of "the difficulty of proving discriminatory intent, New Jersey has adopted the procedural burden-shifting methodology," which was initially articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).

A plaintiff must first establish a prima facie case of discrimination by showing by a preponderance of the evidence that: "(1) he was in the protected group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone else to perform the same work after he left."  <u>Id.</u> At the prima facie stage, "[t]he evidentiary burden . . . is

rather modest: it is to demonstrate to the court that the
plaintiff's factual scenario is compatible with discriminatory
intent-i.e., that discrimination could be a reason for the
employer's action." Marzano v. Computer Sci. Corp., 91 F.3d 497,
508 (3d Cir. 1996).  "The prima facie case is to be evaluated
solely on the basis of the evidence presented by the plaintiff,
irrespective of [the] defendant's efforts to dispute that
evidence." Zive, 867 A.2d at 1139; see Siegel v. Alpha Wire
Corp., 894 F.2d 50, 54 (3d Cir. 1990) (stating defendant's
arguments rebutting plaintiff's prima facie case belong in later
stages of McDonnell Douglas and relying on plaintiff's evidence
alone to find prima facie case satisfied).  The specific elements
of the prima facie case vary depending on the type of
discrimination alleged.  See Murphy v. Hous. Auth. & Urban Redev.
Agency, 32 F.Supp.2d 753, 763-64 (D.N.J. 1999) (explaining that
McDonnell Douglas reasoning for variance of specific elements of
prima facie case in Title VII claims applies equally to NJLAD
claims).

        The establishment of a prima facie case creates an inference
of discriminatory intent on the part of the defendant. Zive, 867
A.2d at 1140.  The defendant must then produce evidence showing
that it made the adverse employment decision "for a legitimate,
nondiscriminatory reason." Id.  "To accomplish this, the
defendant must clearly set forth, through the introduction of

                                   29

admissible evidence, the reasons for the plaintiff's rejection."
Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).
The defendant must make a sufficient showing that would support a
jury finding that unlawful discrimination was not the cause of
the adverse employment action.   St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502, 509 (1993).

     If the defendant comes forth with a legitimate reason for
the employment action, the burden then shifts back to the
plaintiff to show by a preponderance of the evidence that the
employer's explanation was not the true reason for the decision,
but rather was a pretext for the discrimination.   Zive, 867 A.2d
at 1140.  A plaintiff, to prove pretext, may not simply show that
the employer's reason was false but must also demonstrate that
the employer was motivated by discriminatory intent.   Id.  To do
this, the plaintiff must submit evidence from which a factfinder
could either (1) disbelieve the employer's articulated,
legitimate reason, or (2) believe that discrimination was more
likely than not a motivating or determinative cause of the
employer's decision.   Id. at 1144.  Further, the plaintiff

> cannot simply show that the employer's decision was wrong
> or mistaken, since the factual dispute at issue is whether
> discriminatory animus motivated the employer, not whether
> the employer is wise, shrewd, prudent, or competent.
> Rather, the . . . plaintiff must demonstrate such weakness,
> implausibilities, inconsistencies, incoherencies, or
> contradictions in the employers's proffered legitimate
> reasons for its action that a reasonable factfinder could
> rationally find them "unworthy of credence," and hence

infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted).

> 2.   Haselmann's request for a spoliation inference

Haselmann moves for an adverse inference for the defendants' alleged spoliation of evidence.  (Pl. Br., at 15-25.)  Haselmann also asserts that "the spoliation inference coupled with the evidence [he] has identified within his opposition and cross[]motion is so persuasive that no rational fact finder would believe that Defendants acted for their purported legitimate reason."  (<u>Id.</u> at 26.)  Haselmann points out that the defendants have failed to produce and, have actually destroyed, weekly activities reports of other branch managers from 2003 that Stahl allegedly used to (1) compare his sales performance with that of other KFR branch managers, and (2) justify the conditions of his PIP.  (<u>Id.</u> at 15.)  He asserts that "the weekly activity reports are relevant to show disparate treatment, [and are] indicative of pretext."  (<u>Id.</u> at 16.)

Haselmann points out that the defendants did not produce the 2003 weekly activity reports because Stahl had discarded them. (<u>Id.</u> at 17.)  Haselmann contends that the defendants failed to take steps to preserve the reports despite being placed on notice of potential litigation when he raised his "concern about age discrimination and later when his counsel wrote to [them.]"  (<u>Id.</u>

31

at 19.)  Further, he argues that the weekly reports were (1) in the control of KFR and Stahl, (2) destroyed or not otherwise provided to him in discovery, and (3) relevant to litigation because the "reports are a weekly 'snap shot' of each branch manager's personal sales activity and because Haselmann's performance was compared to that of other branch managers in the Eastern Region." (Id. at 19-20.)  Haselmann also argues that, in light of his age discrimination complaint — after being placed on the first PIP — the defendants were on notice that the reports would be discoverable.  (Id. at 22-23.)  Haselmann contends that "without the objective evidence that Stahl used in arriving at the target number of five sales calls per week, [he] is deprived of complete discovery of the actual operation of the process to develop the standard to which he would be held." (Id. at 21.)

The defendants contend that Haselmann has "flatly mischaracterized the nature and circumstances surrounding the so-called 'spoliated evidence,' and attempts to manufacture a prejudice that simply does not exist." (Defs. Opp. Br., at 4.) The defendants argue that the weekly activity reports were not "intentionally destroyed out of any 'well-founded fear that the contents would harm [them],' . . . but rather, in the ordinary course of business, were retained for only a limited period of time." (Id.)  They assert that Haselmann, despite knowing that Stahl did not maintain copies of the weekly reports, raised "an

32

eleventh-hour discovery motion just two days before [they] were
to file their motion for summary judgment."  (Id. at 9.)

The defendants point out that Stahl did not testify that she
relied upon the weekly reports to establish the requirement of 5
sales calls per week.  (Id. at 9-10.)  Instead, Stahl stated that
she "would generally see from [the other branch managers], like
six to eight [sales calls per week]."  (Id. at 10 (citing Stahl
Dep., at 86).)  The defendants also note that the Magistrate
Judge, on September 12, 2005, ruled that the defendants were not
required to produce the weekly activity reports of all branch
managers, but had to only produce the weekly activity reports
that Stahl reviewed in connection with her determination that 5
sales calls per week was a reasonable target.  (Id. at 11.)  The
defendants claim that, consistent with Stahl's deposition
testimony, they had no reports to produce, and then pointed to a
January 2004 spreadsheet of "roundtable statistics" showing the
number of sales calls by other branch managers.  (Id. at 12-13.)
The defendants also assert that Haselmann has failed to show that
he is prejudiced by the non-production of these documents.  (Id.
at 13-14.)

Spoliation is "the destruction or significant alteration of
evidence, or the failure to preserve property for another's use
as evidence in pending or reasonably foreseeable litigation."
MOSAID Techs. Inc. v. Samsung Elecs. Co., 348 F.Supp.2d 332, 335

33

(D.N.J. 2004) (internal citations omitted).  If a party demonstrates spoliation, a court has the following sanctions available: "dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; attorneys' fees and costs." Id.

> The Court may

> impose sanctions under the Federal Rules of Civil Procedure and its inherent power to control litigation. Scott v. IBM Corp[.], 196 F.R.D. 233, 247-[]48 (D.N.J. 2000).  Although, [the] Court has broad discretion in imposing the proper sanctions for spoliation, "[t]he sanction should be designed to [d]eter parties from engaging in spoliation; [p]lace the risk of an erroneous judgment on the party who wrongfully created the risk; and [r]estore the prejudiced party to the same position he would have been in absent of the wrongful destruction of evidence by the opposing party." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

> * * *

> A less serious sanction that may be imposed is the spoliation inference. Mosaid Tech[s.], 348 F.Supp.2d at 335.  Jury instructions permitting the spoliation inference allows the jury to infer that the "destroyed evidence might or would have been unfavorable to the position of the offending party." Id. at 336 (quoting Scott, 196 F.R.D. at 248).  In determining whether the spoliation inference applies, four factors must be satisfied:

>> "[f]irst, it is essential that the evidence in question be within the party's control; [s]econd, it must appear that there has been actual suppression or withholding of the evidence; [t]hird, the evidence destroyed or withheld was relevant to the claims or defenses; [a]nd fourth, it was reasonably foreseeable that the evidence would later be discoverable."

Mosaid Tech[s.], 348 F.Supp.2d at 336.  Such adverse inference does not arise, however, "when the circumstances indicate that the documents or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."  Brewer v. Quaker St[.] Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995).

Travelers Prop. Cas. v. Pavilion Dry Cleaners, No. 04-1446, 2005 WL 1366530, at *2 (D.N.J. June 7, 2005).

Although the weekly activity reports were in the defendants' control, Haselmann has failed to demonstrate that the weekly reports were suppressed.  Haselmann, to show that the evidence was suppressed, must demonstrate "that it was destroyed intentionally and not as a matter of routine disposal."  Scott, 196 F.R.D. at 248.  Stahl testified at her deposition that she did not maintain the weekly reports on a consistent basis. (Stahl Dep., at 69.)  Further, Haselmann argues incorrectly that Scott supports the proposition that "[e]ven if the destruction of evidence occurred as a normal routine of Stahl's house keeping [or susceptible of an innocent explanation such as negligence] . . ., the lesser remedy of a spoliation inference still applies." (Pl. Br., at 20.)  A party seeking a spoliation inference cannot show that the evidence was suppressed if the reports are routinely disposed.  Scott, 196 F.R.D. at 248.  Haselmann has failed to make any showing that the reports were not routinely disposed.  Accordingly, the Court will deny the part of

Haselmann's cross motion for a spoliation inference or other
sanction.[11]

> 3.    Whether disputed issues of material fact exist
>       that would preclude summary judgment

The defendants argue that Haselmann has failed to set forth
a prima facie case of age discrimination.  (Defs. Br., at 9.)
Specifically, they claim that he is unable to establish that he
was performing his job as branch manager in a manner that met his
employer's legitimate expectations.  (Id.)   The defendants
contend that a "critical component" of Haselmann's duties was to
generate new clients in the retail market.  (Id. at 13.)   The
defendants assert that he was made aware of his responsibility to
generate new business while under the Lyons's supervision, and
that he failed to meet this expectation.  (Id. at 14-28.)
Further, the defendants note that Haselmann's performance did not
improve under the initial and Extended PIP.

The defendants also argue that Haselmann cannot satisfy his
ultimate burden of proving pretext.  (Id. at 29.)   The defendants
assert that they have articulated a legitimate reason for
terminating his employment, namely, his failure to perform as
expected, even after being placed on a PIP.  (Id.)   They claim

---

[11] As the Court has found that the defendants have not
suppressed or withheld the weekly reports, the Court need not
address whether (1) said reports are relevant, or (2) it was
reasonably foreseeable that the reports would be discoverable.

that Haselmann has not presented any supporting evidence that his age was the actual reason for his discharge.  (Id. at 32.)

Haselmann asserts that he has set forth a prima facie case of age discrimination because he was (1) a member of a protected class, (2) performing his job at a level that met Kelly's legitimate expectations as he was a branch manager for three years, received a good performance review, a raise and a bonus, (3) discharged, and (4) replaced by someone substantially younger.  (Pl. Br., at 8-9.)  Also, Haselmann claims that the defendants' arguments about the quality of his performance (or any deficiencies) are "more properly debated in the second and third stages of the burden-shifting" analysis.  (Id. at 8.)

Haselmann also alleges that he has shown pretext.  (Id. at 10.)  Haselmann contends that (1) his performance evaluations ranked at "meet and at times exceeds expectations," (2) he received an incentive bonus, and (3) his branch ranking placed him in the top 5 branches nationally.  (Id. at 13.)  Haselmann asserts that when he complained of discrimination, the defendants ignored him.  (Id.)  Also, he states that he was placed on a PIP and subjected to new terms and conditions not imposed upon other branch managers — all who were substantially younger than him — and not set forth in his position description.  (Id.)  Haselmann also argues that the defendants are not entitled to any inference from the "same decision-maker theory" because Stahl, and not

37

Lyons, was the person that judged his performance under the PIPs
and eventually made the decision to terminate his employment.
(Id. at 14-15.)

The Court finds that there are disputed issues of fact as to
whether (1) Haselmann was performing the job of branch manager in
accordance with Kelly's legitimate expectations, and (2) Kelly's
articulated legitimate reasons for terminating his employment
were merely pretextual.  Although the defendants assert that
Haselmann did not generate new retail business as he was required
to as branch manger, Haselmann received at least a satisfactory
mid-year review (from Stahl) in September 2003.  Haselmann claims
that the mid-year review demonstrates that his performance met
the objective factors for success by a branch manager.  Also,
Stahl imposed the 5 sales call per week requirement in October
2003, approximately one month before she put Haselmann on the
first PIP.  Haselmann also received a third-quarter bonus and a
congratulatory note from Stahl on October 30 2003, approximately
two weeks before being placed on the initial PIP.[12]  The Court
further finds that there are questions of material act about how
Stahl developed her performance criteria and whether those

---

[12] Haselmann contends that another disputed issue of fact is
Kelly's alleged lack of investigation into his "charge" of
discrimination.  (Pl. Br., at 13; 6-16-06 Dep., at 40.)  The
Court fails to see how this factual issue would be relevant,
whereas here, the discrimination he alleges came from his
supervisor, who was directly dealing with him in this matter.

standards were consistently applied to other similarly situated employees, including the placement of other branch managers on PIPs.  Thus, the Court will not enter summary judgment in favor of either party on the NJLAD claim.

### C.   Constructive Discharge

The defendants contend that summary judgment should be granted in their favor on Haselmann's constructive discharge claim.  (Defs. Br., at 3 n.1.)  They assert that the claim "would clearly be rendered moot by [Haselmann's] actual termination." (Id.)  Haselmann has failed to oppose this part of the motion. The Court finds that Haselmann cannot maintain a constructive discharge claim as a matter of law.

A constructive discharge occurs when the employer has imposed upon an employee working conditions "so intolerable that a reasonable person subject to them would resign."  Muench v. Twp. of Haddon, 605 A.2d 242, 249 (N.J. App. Div. 1992).  The standard for constructive discharge envisions a "sense of outrageous, coercive and unconscionable requirements."  Jones v. Aluminum Shapes, Inc., 772 A.2d 34, 44 (N.J. App. Div. 2001). However, an employee who is fired cannot maintain a claim for constructive discharge.  See, e.g., Espinosa v. County of Union, No. 01-3655, 2005 WL 2089916, at *11 n.6 (D.N.J. Aug. 30, 2005) (explaining that constructive discharge claims refer to situations in which employees are not fired, but resign).  Here,

Kelly terminated Haselmann's employment on February 4, 2004. Accordingly, the Court will enter judgment in favor of the defendants on Haselmann's constructive discharge claim.

**D.   IIED Claim**

The defendants contend that the Court should enter summary judgment in their favor on Haselmann's IIED claim because he has failed to show conduct sufficiently "atrocious" or "utterly intolerable in a civilized society." (Defs. Br., at 38-40.) Haselmann also has not opposed this part of the motion. The Court finds that the plaintiffs have failed to set forth a cognizable claim for IIED.

To support a claim for IIED, a plaintiff must show that (1) the defendants acted intentionally or recklessly, (2) the defendants' conduct was extreme and outrageous, (3) the defendants' actions were the proximate cause of the plaintiff's emotional distress, and (4) the plaintiff's distress was "so severe that no reasonable [person] could be expected to endure it." Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988). A plaintiff must prove that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to liability for IIED. Taylor v. Metzger, 706 A.2d 685, 694 (N.J. 1998).

40

The complaint, even construed most favorably to Haselmann, asserts that the defendants imposed additional requirements upon him, subjected him to PIPs, and otherwise discriminated against him because of his age.  Courts have refused to impose liability in cases involving more outrageous conduct than here.  Ramirez v. United States, 998 F.Supp. 425, 434 (D.N.J. 1998) (IIED claim dismissed where plaintiff detained for over 2 1/2 hours based on unreasonable assumption that he was person named in warrant); Zamboni v. Stamler, 847 F.2d 73, 80 (3d Cir. 1988) (IIED claim insufficient where defendant constantly harassed plaintiff in workplace causing physical and psychological problems).  The Court finds that the defendants' conduct did not rise to the level necessary to maintain a claim for IIED.

The Court further finds that Haselmann failed to allege or make any showing that the defendants caused him emotional distress so severe that no reasonable person could be expected to endure it.  Plaintiffs are required at least to allege the kind of illness or stress they endured for their claim to survive a motion to dismiss.  Buckley, 544 A.2d at 864-65.  Mere allegations of aggravation or embarrassment, without more, are insufficient for a claim of IIED.  See id. at 864 (concluding complaints of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" insufficient to establish severe emotional distress).  Haselmann's allegations of "severe injury,

including emotional distress, [and] humiliation" are insufficient
for a claim of IIED.

Haselmann also has failed to allege the particular type of
illness or stress that he suffered because of the defendants'
conduct.  Plaintiffs must assert that they sought treatment for
their alleged distress.  <u>Mardini v. Viking Freight, Inc.</u>, 92
F.Supp.2d 378, 384-85 (D.N.J. 1999) (granting motion to dismiss
IIED claim because plaintiff did not seek medical assistance or
allege specific ailments); <u>Harris v. Middlesex County Coll.</u>, 801
A.2d 397, 405-06 (N.J. App. Div. 2002) (affirming IIED dismissal
where plaintiff failed to allege need for psychiatric
counseling); <u>Aly v. Garcia</u>, 754 A.2d 1232, 1237 (N.J. App. Div.
2000) (stating IIED claim should be dismissed where no evidence
that plaintiffs sought medical treatment for alleged distress).
Haselmann has not alleged or made any showing that he sought
medical treatment for his alleged distress.  Therefore, the IIED
claim is without merit.

### <u>CONCLUSION</u>

There are disputed issues of material fact that preclude the
Court from entering summary judgment on Haselmann's age
discrimination claim under NJLAD.  Haselmann also has failed to
show entitlement to a spoliation inference based on the non-
production of the 2003 weekly activity reports.  However,
Haselmann cannot maintain his claims for constructive discharge

and IIED.  Accordingly, the Court will (1) grant the part of the motion seeking summary judgment on the claims for constructive discharge and IIED, (2) deny the part of the motion seeking summary judgment on the NJLAD claim, (3) deny the part of the cross motion seeking summary judgment on the NJLAD claim, and (4) deny the part of the cross motion seeking an adverse inference or other sanction for spoliation of evidence.

       s/ Mary L. Cooper       
**MARY L. COOPER**
United States District Judge
